UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DALE YURK,

     Plaintiff,

v.

APPLICATION SOFTWARE
TECHNOLOGY CORP.,

     Defendant.

Case No. 2:15-cv-13962
Honorable Laurie J. Michelson

---

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [34]**

---

For about a year, Plaintiff Dale Yurk worked as a software developer for Defendant Application Software Technology Corporation. The parties disagree as to why Yurk's employment ended. AST paints a picture of an employee who did not perform well, was given a chance to improve, but instead of seizing the opportunity, acted disrespectful to others and repeatedly raised issues outside the scope of his job duties. Yurk, on the other hand, says he was fired because he reported or was about to report to the public that AST was acting unlawfully. Yurk thus filed suit claiming that his termination was contrary to Michigan's public policy and Michigan's Whistleblowers' Protection Act.

AST seeks summary judgment. (R. 34.) It argues, among other things, that no reasonable jury could find that Yurk's report to an attorney or threat to report to the City of Detroit made any difference in its decision to terminate his employment. As explained in great detail below, the Court agrees.

# I.

## A.

Yurk, an experienced software developer, was hired by AST in August 2014. (R. 34, PID 431.) AST hoped that Yurk's technical skills would allow Timothy Brocker, Yurk's direct supervisor, to spend more time on sales and marketing. (*See* R. 34, PID 431.)

Yurk was given a website design project in early December 2014 that did not go well. (*See* R. 34, PID 383, 456.) According to Shyam Kumar, Brocker's direct supervisor (and thus two levels above Yurk), Yurk was to complete "a very small," "one page" write-up on AST's middleware practice. (R. 34, PID 456.) But according to Yurk, Shyam "wanted a brochure, and I said, Shyam, you know, that's media, that's not my specialty, I'll make an outline for you." (R. 34, PID 384.) In either case, Shyam was "unhappy" with Yurk's work product. (R. 34, PID 384.) This apparently prompted Shyam to question a friend of Yurk's in an attempt to find out what Yurk's personality was like or, according to Yurk's friend, get "ammunition" on Yurk. (R. 34, PID 384.) Shyam also spoke with Yurk's immediate supervisor. (R. 34, PID 384, 456.) Shyam asked Brocker to either ensure that deliverables met his expectations or to allow him to work directly with Yurk or, if neither of those were viable solutions, "to let [Yurk] go." (R. 34, PID 456.) This prompted Yurk to talk to Fatima Beach, the vice president of human resources at AST. Yurk thought the firing option was unreasonable given that he had not been trained to create media. (*See* R. 34, PID 388.)

Beginning in December 2014, and through April 2015, Yurk worked on a project that AST was doing for Underwriters Laboratory. From Brocker and Shyam's perspective, this project also did not go well. (R. 34, PID 431.) Brocker recalled that because Yurk often did not complete project status reports appropriately, he was repeatedly forced to step in to handle that

task. (R 34, PID 433.) Shyam recalled: "So [Yurk] was supposed to be leading that project, and we used to have a lot of issues, challenges; the quality of the report was not good, data was not right." (R. 34, PID 453.) Brocker also recalled that instead of "roll[ing] up his sleeves" to do certain tasks on the Underwriters Laboratory project himself, Yurk asked for another person ("resource" in AST parlance) to be added to the project. (R. 34, PID 436.)

In January 2015, Brocker and Yurk talked about "whether or not [Yurk] wanted to start looking for another position" or try to improve his relationships with management and others at AST. (R. 34, PID 434.) Brocker recalled, "[Yurk] said to me yes, you know, I can be a bit abrasive and things but I want to work through that, I want to be here." (R. 34, PID 434.)

Around this time (or not too long thereafter), Brocker completed Yurk's performance review. He gave Yurk a "satisfactory" rating on a scale of "unsatisfactory," "satisfactory," and "exceeds expectations." (R. 34, PID 434.) Brocker later testified that while the "satisfactory" was accurate, he gave Yurk the rating in part because he "wanted to give [Yurk] . . . a chance and not take him down so early in his tenure with AST." (R. 34, PID 434, 445.) Yurk also received a raise and a bonus in 2015. (R. 34, PID 459.)

**B.**

During Yurk's employment at AST, AST was working on a $17 million project for the City of Detroit. (R. 36, PID 688.) The project was high visibility and critical to AST. (R. 34, PID 488; R. 36, PID 688.) The project team had "40-plus" members, led by Usha Vargas. (R. 34, PID 503.) Shyam was also involved in the City project. (R. 34, PID 404.) Brocker was not.

In May or June 2015, Zeeshan Baig was leaving (or, in AST parlance, "rolling off") the City project and Yurk was assigned (or "rolled on") to the project. (*See* R. 34, PID 389, 390, 439,

488.) Baig explained, "my three, four month's knowledge of the integration requirements [for the project] . . . I wanted to transfer to Mr. Dale [Yurk] and Mr. Kant." (R. 34, PID 488.)

"Mr. Kant" was Mrityunjay Kant and the parties dispute whether he was Yurk's superior on the City project. At AST, in addition to a company supervisor (Yurk's was Brocker), an employee may have a supervisor on a particular project (Brocker was not working on the City project). (R. 34, PID 460.) Team leader Vargas testified that she held Kant "responsible for the delivery" of the architecture on the City project. (R. 34, PID 504.) Indeed, in one email, Vargas directed Yurk to "follow [Kant's] direction on this project." (R. 34, PID 398, 504.) In that same email exchange, Shyam similarly stated, "[Kant] is leading this project, I have 100% faith in his ability, so we have to follow his path including me." (R. 41, PID 862.) As for Kant's take, he later recalled, "all of the middleware integration team members," including Yurk, "were supposed to take instructions from me." (R. 34, PID 473.)

Yurk viewed Kant's role on the City project differently. At the time, Kant and Yurk had the same job title at AST. (R. 34, PID 392.) Thus, from Yurk's perspective, it was Vargas who was his direct supervisor on the City project. (R. 34, PID 392–93, 398.) Yurk testified: "every project someone has got to divvy up the work, and that was [Kant's] role. I mean, we all had our individual roles, but . . . it wasn't like I reported to him[.]" (R. 34, PID 392.)

Yurk, Kant, and Baig did not get off on the right foot on the City project. In June 2015, shortly after Yurk rolled on, the three planned to meet onsite in Detroit (apparently so that Baig could transition his knowledge to Yurk and Kant). (R. 34, PID 490.) Yurk had been approved to work at his home in Fenton the day of the planned meeting. (R. 34, PID 390.) Kant was to fly in from Illinois the night before the meeting but missed his flight. (R. 34, PID 472, 535.) Yurk did not receive notice from Kant that he would not be attending until after Yurk had already made

the hour-long drive to the Detroit office. This upset Yurk: "I said to [Baig], you know, this is bullshit, I came in here—and then I think that this is rude of Mrityunjay [Kant]—and, you know, you can tell him I said it's rude, and I went back to my desk to pack my computer up, and Zeeshan [Baig] came up to me and he said, you can't talk about Mrityunjay that way. And I said the hell I can't, I can talk about—I can tell that you that Mrityunjay—that this was rude, this was unprofessional behavior. And [Baig] got very upset that I would say something about Mrityunjay." (R. 34, PID 390.) Baig recalled that Yurk was loud and that "the hall was full of our team from AST people and maybe some customers on-site as well." (R. 34, PID 490.)

Both Baig and Yurk made reports to HR about the incident. Yurk—apparently in the "sarcastic fun" tone that he often used in emails to his supervisor—wrote the following to Brocker: "I'm not going to do the HR thing. If I'm in trouble over that minor of an [in]cident, then so be it. The nerve of that overly sensitive little prick." (R. 34, PID 395.)

A few days later, Vargas sent an email wishing Baig well on his next project and complimenting Baig's work on the City project. (R. 34, PID 499.) Yurk, still upset about Baig's HR complaint, sent Baig a sarcastic response that included language meant to "hurt" Baig. (R. 34, PID 395.) Yurk wrote: "Well I'm sure that Usha [Vargas] is really technically cognizant with your SOA [Service-Oriented Architecture] contributions to this project. I didn't know that she was so involved in the SOA architecture or technically capable of determining you skillset! Wow! Please don't worry that her message might be generic to anyone leaving the project I'm sure she's right. I'm sure your contributions were exemplary. I'm sure well all miss you. Me, of course, the most! For sure?" (R. 34, PID 498.) Yurk would later testify: "I am very, very disappointed in . . . myself to have sent [that email] . . . . This was my frustration with Zeeshan

over the HR complaint, and I regret this very much. And I later apologized to him for it." (R. 34, PID 395.) Baig accepted Yurk's apology and the two moved on. (R. 34, PID 402, 409.)

While Yurk's issue with Baig was limited to the HR complaint Baig had filed, his "attitude toward Mr. Kant . . . was a totally different matter." (R. 34, PID 402.) From Yurk's perspective, he and Kant "were equals," yet Kant had "some sort of control issue" and would tell Yurk things like "you shall respect me." (R. 34, PID 397, 402.) Yurk recalled discussing with Brocker: "I . . . said, Tim, I'm having problems with Mrityunjay. Tim said everybody on Mrityunjay's projects have problems with him, he's a control freak, he's a prick, just don't worry about it." (R. 34, PID 403.) Yurk recalled, "if [Kant] wanted to treat me poorly, then I guess I was willing to treat him poorly as well." (R. 34, PID 397.) Yurk would repeatedly call Kant "MK," which Yurk knew irritated Kant. (R. 34, PID 397, 409.) (Although Baig also referenced Kant as MK in an email, unlike Yurk, he did so once, apologized, and stopped. (R. 34, PID 490.))

On July 6, 2015, Yurk emailed Brocker complaining about a task Kant had assigned. Yurk wrote in part, "Damn I'm sick of this. When things were going ok at [Underwriters Laboratory] I turned down two good job offers. What an idiot! Ah, don't mind me. Just the normal Monday in Detroit blues." (R. 41, PID 866.)

## C.

The difficulties between the team members on the City project continued over the next 10 days.

### 1.  July 7, 2015

On July 7, an email exchange with Baig led Yurk to question whether AST was designing software for the City in a legal manner. Yurk asked Baig why the software for the City project

was storing a username and password for each interface call (instead of a single username and password) and why the usernames and passwords were being stored in a database table (instead of, for example, a resource file). (R. 34, PID 772.) Baig emailed back that it was to "make our product flexible." (R. 34, PID 771.) To which Yurk responded: "[T]his is not a product, but rather a solution. This design adds a lot of effort. Doesn't Detroit have to pay for it? Don't they own the Intellectual Property?" (R. 36, PID 771.) Baig emailed back: "From day 1 our primary goal was to design this solution as a product which could be reused . . . . Detroit is not paying for it they are purchasing [a Service-Oriented Architecture] license only, this is AST's product similar to EBS-WAM solution we have done at other clients." (R. 36, PID 770.) Yurk replied, "Isn't Detroit paying for our consulting time to implement this particular solution? Which, as you point out, could have been done far quicker with BPEL processes. I don't know about you, but I'm billing all my time to the project. None of this goes to 'product development.'" (R. 36, PID 770.)

At this point, Kant, who had been copied on the emails between Yurk and Baig, intervened: "These discussions and reviews have already been done and appropriate design was created as a result. If you [have] questions related to the current design decisions or have questions related to why you were not consulted during this phase, please address them to me directly. As far as product discussion is concerned it's not something that is relevant to the project, please do not engage in discussions which are not relevant to the project." (R. 36, PID 770.) Kant would later explain that he told Yurk to direct his design questions to him because "I was the one assigning all the tasks and leading the integration part of the project. . . . I understood Mr. Yurk was asking a design question to Mr. Baig, and the answer that Mr. Baig gave was not the answer that was correct from my assessment." (R. 34, PID 479.) Yurk

responded to Kant: "Geez, sorry I included you in the [email] thread. It was a philosophical discussion between Zeeshan [Baig] and I. It was not intended to provoke you into a dissertation. So sorry." (R. 36, PID 769.) To which Kant wrote: "Kindly stick to only relevant discussions." (R. 34, PID 769.) This prompted Yurk to respond: "Kindly allow me to decide what is relevant for discussion subject matter. There is absolutely no need to act like a dictator. I am a person with the same rights that you have. If you have a problem with that, go read the constitution." (R. 36, PID 769.)

Vargas (the manager of the City project) had been copied on the back and forth between Yurk and Kant. Vargas emailed Beach in HR: "Hi, Fatima. Dale is causing unnecessary friction by constantly challenging his team leads. I will schedule a meeting." (R. 34, PID 509.)

Also on July 7, Yurk emailed Brocker: "It sure looks like Mrityunjay [Kant] and Zeeshan [Baig] came up with a 'product', rather than the cheapest solution. Why on earth would the [City] ever agree to pay consulting fees for a longer engagement to provide AST with a commodity? Is this something the two of them did? Wouldn't the client normally own the Intellectual property rights? Does this seem kosher to you? Do you think Shyam [Kumar] knows about it?" (R. 34, PID 811.)

Yurk testified that after learning of the multiple-username design, he tailored his work to avoid furthering that design. (R. 34, PID 421.) Yurk explained that if he was assigned a task that he thought required him to engage in unlawful activity, "I would not refuse verbally, I just wouldn't work on it, I would work on something else." (R. 34, PID 421.)

## 2. July 8, 2015

The next morning, Vargas held a meeting with Kant and Yurk. (R. 34, PID 509; R. 36, PID 787.) Yurk expressed concern over whether the City had been told that the chosen design

was a costlier option and "brought up 'personal liability' and that he was going to contact an attorney." (R. 34, PID 787.) Yurk also expressed that there was a "dictatorship and censorship environment" where if he was asked to jump, he needed to respond "how high." (R. 34, PID 787.) For his part, Kant told Yurk that the architecture decisions had been made above Yurk's level and that it was not wise for Yurk to presume he knew all that had been involved. (R. 34, PID 787.) According to Vargas' meeting notes, "[Kant] [a]sked Dale not to refer to him as MK [but] Dale continues to do this repeatedly (Dale said he would still do this)." (R. 34, PID 787.) Vargas also noted: "It was my conclusion at the end of the meeting that Dale was combative, argumentative and disrespectful not only with his lead but also towards the Practice leadership and AST as a whole. This resource is creating a hostile work environment and is creating a project risk." (R. 34, PID 787.)

Later the same day, Yurk emailed Vargas "to clarify the two questions" he had raised at the morning meeting. (R. 36, PID 777.) Those two questions: "Was the City of Detroit informed that there were less robust and elegant SOA solutions that could be implemented less expensively than the current metadata driven architecture?" and "Did the City of Detroit release its ownership of the Intellectual Property rights to this effort that would normally belong to any client paying for a custom solution?" (R. 36, PID 777.) Yurk concluded his email by saying, "I'm not trying to create issues, I'm trying to provide a comfort level with what I heard yesterday from Zeeshan [Baig]. He clearly states that this solution was always intended to be a reusable product." (R. 36, PID 777.) Although not in this email to Vargas, and not in any email in the record, Yurk later recalled, "I told Usha Vargas in an e-mail if I do not get a response on this, Usha, I am going to go to the city." (R. 34, PID 408.)

Vargas forwarded Yurk's email to Beach in HR and added the following: "[Yurk] is still not focusing on his assignments and is a risk to the project despite my clear conversation with him this morning. I am requesting that this resource be rolled off as soon as possible." (R. 34, PID 777.) Vargas would later explain that she requested Yurk to be removed from the City project because "the tone of the emails was constantly questioning things that had nothing to do with the work he's supposed to be doing." (R. 34, PID 777.)

Meanwhile, Yurk had been emailing his brother who was also a software developer. Yurk had forwarded the email exchange between him and Kant from the day before and asked his brother, "[L]et me know what you think of this. I could be the one that's wrong. [W]ho knows?" (R. 41, PID 869.) Yurk's brother responded: "It all comes down to how much you want to keep working for AST. If you want out, I think this is a legitimate opportunity to get out and have leverage for, at a minimum, a nice little severance." (R. 41, PID 869.) In another email, Yurk sent his brother a "technical design" document for the City project and stated, "You'll notice the author is Zeeshan, the guy who, now, according to dickhead [Kant], is wrong about this solution being a 'product'. Note that AST has a history of doing this very thing." (R. 41, PID 883.) By "history," Yurk was apparently referring to the fact that "Brocker was creating a product based on what he learned from Underwriters Laboratory" and that Baig had referenced creating a product on other projects in his email. (R. 34, PID 406.) Later that same day, Yurk emailed his brother that he had "walked up to where [Kant was] sitting, leaned way, way over the desk and just stared at him for like, honestly, 30 seconds." (R. 41, PID 913.) Yurk continued, "Then I said in a very low voice, 'You'll get respect when you give it, MK'. I started to walk away and he stated yelling something to me but I just kept walking. At least I finally cracked him a bit." (R. 41, PID 913.) Yurk's email to his brother concluded, "I just get that scratchy feeling that shit

is rolling right now. I'll keep you posted. But I've prepared for this the best I can. The Zeeshan emails and my questions will provide decent fodder for a Whistleblower suit. Well, hope so anyway." (R. 41, PID 913.)

### 3. July 9, 2015

The next day, Kant emailed Vargas: "I think we should ensure that Dale's questions are fully answered. He has based all his assumptions on the attached email here. Zeeshan [Baig] is confused himself on the purpose of various design decisions and has incorrectly assumed this is because of product solution. I'm not sure what would be the best way to address the concerns, but they should be addressed and all doubts removed." (R. 34, PID 809.)

That same day, Yurk sent a lengthy email to Brocker. Yurk wrote: "I was a little surprised when you told me that Shyam [Kumar], Zeeshan [Baig], and Mirtyunjay [Kant] were nervous over my questions about the SOA design for Detroit. Why would they be nervous if they have nothing to worry about? That makes ME nervous!" (R. 36, PID 789; *but cf.* R. 34, PID 443.) Yurk's email to Brocker continued by recounting a situation that his brother had reminded him of: Oracle (a large software company) and one of its developers, Brian Kim, had been sued for $6 billion because Kim had followed management's orders to make certain functions appear operational during a product demo. (R. 34, PID 443.) Yurk's email to Brocker continued: "I talked to an attorney. American jurisprudence says knowledge of a wrong, without action, is the same as committing the wrong yourself. So all I'm doing is trying to find out if there's a 'wrong'. What's so bad about that? I'm not going to wind up like Brian Kim." (R. 34, PID 789–90.) Yurk continued, "I don't know Tim. I'm worried myself. I guess I'm going to have to decide if I have the guts to contact the City myself. If Shyam [Kumar] and Company don't show me that all is as it should be, I'm going to have to make that decision, and soon. If everything is kosher, it

shouldn't matter. But the fact that Shyam and the boys are nervous really scares me." (R. 36, PID 789.) Yurk's email concluded: "Damnit, I wish I had never taken this job. AST has over 45 people on this project. I'm worried about hurting them, too. What a mess. But I will not ignore it, or turn my head the other way, or think of it as business as usual. NO WAY. Brian Kim did that and look what happened. If you have any advice, or can offer some way around this, please let me know!!!" (R. 36, PID 789.)

### 4. July 10, 2015

The next day, Kant filed a complaint with HR against Yurk. (R. 36, PID 814.) Kant later testified that he asked that Yurk be removed from the City project because "Yurk was continuously not cooperating on the project by doing the tasks assigned in the time intervals expected." (R. 34, PID 482.) And Kant indicated that the final straw was the incident where Yurk had come to his desk, leaned over, and stated that he would continue to call him "MK." (R. 34, PID 482.) Kant recalled telling HR, "I cannot work with a person who is willfully disrespecting, unprofessional and threatening in a professional situation, the workplace is a safe environment." (R. 34, PID 482.)

At the subsequent meeting with HR regarding Kant's complaint, Yurk stated that AST was big on reusing its creations, explained that he had contacted an attorney about the situation, asserted that Kant had been disrespectful, and repeatedly remarked that he "shouldn't have taken this job." (R. 34, PID 814.)

Also on July 10 (or right around that date), Shyam (Brocker's supervisor) sent an email to several people, including Vargas. (R. 34, PID 515.) Shyam expressed that everyone would benefit from Yurk rolling off the City project. (R. 34, PID 515.) Vargas agreed. (R. 34, PID 515.)

Yurk was assigned to work on a demo that AST was putting together for the College of American Pathologists. (R. 34, PID 452; *see also* R. 34, PID 409.) Yurk later explained that he was "relieved" when he was removed from the City project. (R. 34, PID 409.) He further recalled, "I was disappointed, but I was put on finally a WebCenter Portal project, which was my strength, and I worked very hard that following week with Tim [Brocker] to try and get this demo put together for the College of American Pathologists." (R. 34, PID 409.)

### 5. July 14, 2015

Four days later, perhaps because human resources had suggested it (*see* R. 36, PID 729), Yurk emailed AST's CEO, Pravin Kumar. Yurk wrote, "I'm sending you a copy of an email I sent to Tim [Brocker] last week. . . . I have not received any response, formally, from management. As you can see from the details below, my concerns over liability have a real history. I'm not trying to cause issues." (R. 34, PID 529.) Yurk's reference to the "email [he] sent to Tim last week" was Yurk's lengthy email to Brocker where Yurk stated he was not going to end up like Brian Kim from Oracle. (*See* R. 34, PID 529.)

As Pravin received Yurk's email on his phone in the midst of a conference, he did not read all of Yurk's email to Brocker and so Pravin's reaction was that management had not been responsive to Yurk. (R. 34, PID 529.) Pravin thus called Shyam: "I called the practice VP to say does he know about it, he needs to respond to it." (R. 34, PID 529.) According to Pravin's notes of that call, Shyam indicated "that Dale may be creating this issue late in the project cycle as a diversionary tactic to deflect the attention from the delay in his assigned development work and from his aggressive behavior and unprofessional conduct in working with Zeeshan [Baig]." (R. 34, PID 526.) Consistent with Pravin's notes, Shyam would later testify that when Brocker (or others) informed him of Yurk's concerns about the City project he "just laughed" "[b]ecause

it was not something that we were doing, and this was a good opportunity for Dale to perform in the project. But, rather, he was thinking something not appropriate, you know." (R. 34, PID 458.)

Late on the night of July 14, Brocker responded to Yurk's email (the one referencing Brian Kim). (R. 36, PID 789.) Brocker wrote: "[I] just saw your email. I think you have gone way too far here and for some reason are reading things into our conversation that was not the intent of the discussion." (R. 36, PID 789.) Brocker continued, "I thought I was clear, but maybe not. I said that the reason they would be nervous is if you start making unfounded statements to the customer before checking your facts. Speaking out of your own fear and causing unnecessary confusion with the customer." (R. 36, PID 789.) Brocker's email to Yurk concluded, "We discussed the process. Contracts are negotiated between AST and the customer, design specifications are developed and approved by the customer, and AST delivers to the specification that are signed off on by the client. I have no reason to believe that process is not being followed." (R. 36, PID 789.)

### 6. July 15, 2015

Early the next morning, Yurk did two things relevant to this case. He responded to Brocker's email from the night before: "I'd like to discuss this. This is not true." (R. 41, PID 917.) And he filed a formal complaint with HR regarding Shyam's conduct seven months earlier. (R. 41, PID 854–60.) Yurk complained that Shyam had asked "interview" like questions to a non-AST-employee about an AST employee (him). (R. 41, PID 853.)

Later that day, Beach (HR VP) emailed Pravin (CEO): "I just had a conference call with T. Brocker and S. Kumar. They both have changed their stance and have recommended to let Dale go BUT suggested the conversation between you and Dale should still occur (Dale told Tim he was going to talk to you and I confirmed that he reached out to you)." (R. 36, PID 792.)

14

At his deposition in this case, Yurk remarked that he had come across this email from Beach to Pravin in reviewing his case and thought it was "very curious." (R. 34, PID 423.) Yurk speculated that since Brocker and Shyam had already decided to terminate his employment, the meeting with Pravin was merely to silence him: "[Kant] is the one that recommended that harsher action be taken [against me]. . . . And this [is] just conjecture, but . . . Zeeshan [Baig] is the one that opened up the can of worms and blew the whistle on AST himself literally, and Mrityunjay [Kant] had spen[t] the entire time trying to cover it up, and so Mrityunjay in his thinking would have said, yeah, let Pravin talk to him and maybe that will shut him up after we fire him." (R. 34, PID 423–24.)

Pravin offered a different explanation for meeting with Yurk. He stated that Yurk's termination was "recommended to Fatima, that much we know, but wouldn't know that that's final." (R. 34, PID 556.) When asked if he had ever heard of an instance where the vice president of the employee's practice group and the vice president of HR had recommended termination but the termination was not carried out, Pravin testified: "yes, it's—a lot of times it's never carried out." (R. 34, PID 556.) Pravin explained that AST took "talent very seriously," that it was not easy to find the right people, and so on "several" occasions "we have moved people from one practice to another because their roles will be more suited . . . so it is done a few times." (R. 34, PID 556.)

### 7. July 16, 2015

On July 16, Pravin conducted a number of interviews of AST employees, including Brocker, Kant, and Shyam, and took notes of each interview. (R. 34, PID 526.) After interviewing Kant, AST's CEO wrote, "MK confirmed that the various approaches for integration were discussed with the City as early as April and the approach being adopted was

the best option and was now . . . being developed with the City's approval just like the other components of the system." (R. 34, PID 527.) Pravin further noted, "MK was of the opinion that Dale is raising irrelevant issues to divert attention from his own lack of progress on the work and ability to handle the SOA development." (R. 34, PID 527.) Pravin also noted that he (Pravin) had personally reviewed the City contract and confirmed that it had "provisions for joint ownership of the IP." (R. 34, PID 527.)

Having interviewed several AST employees and reviewed the contract, Pravin called Yurk (with Beach participating on the call). (R. 34, PID 527–28.) Yurk acknowledged that the chosen design was more robust than others, but asked if the City knew that it was also more costly than others. (R. 34, PID 528.) According to his notes, Pravin explained to Yurk that "all options were discussed with the client . . . and the client ha[d] approved the approach [AST] [was] taking." (R. 34, PID 528.) Pravin also told Yurk that he had reviewed the contract with the City. (R. 34, PID 528.) According to Pravin's notes: "The City has the perpetual right to use any code without paying any royalty and AST's rights are protected as well to use and reuse the intellectual property." (R. 34, PID 528.)

At his deposition, Yurk expressed disbelief that the City could have approved AST's design. He explained, "[t]he design document that I sent my brother was a work in progress . . . It's not finished. . . . And they say it was approved by the client. How could it have been when they had no design document?" (R. 34, PID 418.)

### 8. July 17, 2015

Although Brocker and Shyam had recommended Yurk's dismissal prior to Yurk's meeting with Pravin, Brocker did not inform Yurk that he was terminated until the day after Yurk met with AST's CEO. (R. 1, PID 14; R. 34, PID 410.)

Brocker later explained what led him to recommend Yurk's dismissal: "it was a question going into the [Underwriters Laboratory] project in June because of events that transpired even back then. So it was known that I was trying to work with him and turn him around, give him an opportunity, and it wasn't working." (R. 34, PID 445.) Shyam recalled Brocker telling him that "[Yurk] was not getting along well with the team, his performance on the project was not up to the mark. And then we already had, you know, issues in the past." (R. 34, PID 459.)

The ultimate decision to terminate Yurk rested with Shyam, but he based his decision on Brocker's recommendation. (R. 34, PID 461.)

## D.

Yurk never did report, and to this date has not reported, any wrongdoing on the part of AST to the City.

## E.

Yurk filed this lawsuit in October 2015. Yurk asserted two claims: that his termination was contrary to public policy and that it violated Michigan's Whistleblower Protection Act. (*See* R. 1.) The Court previously dismissed the public-policy claim without prejudice. *See Yurk v. Application Software Tech. Corp.*, No. 2:15-CV-13962, 2017 WL 661014, at *3 (E.D. Mich. Feb. 17, 2017). AST now seeks, on a host of grounds, summary judgment on the WPA claim. (R. 34.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## III.

As relevant here, Michigan's Whistleblower Protection Act prohibited AST from firing Yurk (or otherwise depriving Yurk of a "privilege[]" of his employment) "because [Yurk] . . . report[ed] or is about to report . . . a violation or a suspected violation of a law . . . to a public body[.]" Mich. Comp. Laws § 15.362.

When, as here, an employer seeks summary judgment on a WPA claim and there is no direct evidence of retaliation, courts apply the familiar *McDonnell Douglas* burden-shifting framework. *Debano-Griffin v. Lake Cty.*, 828 N.W.2d 634, 638 (Mich. 2013); *see also Roulston v. Tendercare (Michigan), Inc.*, 608 N.W.2d 525, 530 (Mich. Ct. App. 2000). Under this framework, the employee has the initial burden of establishing a *prima facie* case of retaliation (that he engaged in protected activity, that his employer took an adverse action, and that there is the requisite causal connection between the protected activity and the adverse action). *Pace v. Edel-Harrelson*, 878 N.W.2d 784, 787 (Mich. 2016). If the employee does so, the employer then has the "burden of producing evidence" that the adverse action was for a "legitimate, non-[retaliatory] reason." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522 (2001). If the employer succeeds, the burden of production shifts back to the employee to show that a reasonable jury could find not only that the employer's articulated reason was false, but that it was a cover up for retaliation. *See Debano-Griffin*, 828 N.W.2d at 638 (quoting *Hazle*, 628 N.W.2d at 522).

## A.

The parties dispute whether Yurk has established a *prima facie* case of retaliation. For its part, AST offers three arguments for why Yurk did not engage in protected activity, i.e., that Yurk did not report and was not "about to report" a suspected violation of law to a public body. (*See* R. 34, PID 365–72.) AST also says that even if Yurk did engage in protected activity, the

evidence does not demonstrate the required causal connection between that activity and an adverse action. (R. 34, PID 373–75.) For his part, Yurk points out that he did report a suspected violation of law to an attorney. *See McNeil-Marks v. Midmichigan Med. Ctr.–Gratiot*, 891 N.W.2d 528, 538 (Mich. Ct. App. 2016) ("[A] licensed Michigan attorney . . . qualifies as a member of a 'public body' for WPA purposes"), *appeal granted*, 889 N.W.2d 248 (Mich. 2017). And he argues that he was "about to report" a suspected violation of law to the City of Detroit. (R. 36, PID 692–96.) He also argues that because the time period between raising his concerns with AST and his termination was so short, and because AST's CEO met with him only after he had been fired, the record establishes the causal connection required for a *prima facie* case of retaliation. (R. 36, PID 697–99.)

The Court need not wade into the parties' dispute at the first step of the *McDonnell Douglas* framework. Instead, the Court assumes, without deciding, that Yurk has established a *prima facie* case of retaliation. The Court may proceed this way because it finds that AST has articulated legitimate, non-retaliatory reasons for firing Yurk and that Yurk has failed to show that AST's reasons are a cover up for retaliation.

**B.**

AST has adequately demonstrated that it had a non-retaliatory reason for terminating Yurk's employment. In its motion, AST says that it terminated Yurk "because of his unacceptable performance as well as the inability to work professionally in a team environment." (R. 34, PID 375.) Of course, merely declaring a reason for an adverse employment action does not discharge an employer's burden at this second step of the *McDonnell Douglas* framework. *See Hazle*, 628 N.W.2d at 522 ("[D]efendant cannot meet its burden merely . . . by argument of counsel."). But there is ample evidence backing AST's claim that it fired Yurk due to

unacceptable performance and his inability to function well on a team. It was summarized above, and the Court will review it again below. For present purposes then, it suffices to point out that there is evidence that Yurk did not perform well on the website project or the Underwriters Laboratory project and had—to put it mildly—difficulties working with Kant on the City project. AST has thus carried its burden to show that it terminated Yurk for legitimate, non-retaliatory reasons.

## C.

So the burden of production shifts back to Yurk. At this final step of the *McDonnell Douglas* framework, any presumption of retaliation "drops away," *Hazle*, 628 N.W.2d at 522, and the question is "[retaliation] *vel non*," *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000). In other words, "[t]he inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether [Yurk's protected activity was] a motivating factor, namely, whether it made a difference in the contested employment decision." *Hazle*, 628 N.W.2d at 522; *see also* Mich. Model Civ. JI 107.03, *Whistleblowers' Protection Act: Causation* ("Protected activity does not have to be the only reason, or even the main reason, but it does have to be one of the reasons *that made a difference* in defendant's decision to [discharge] the plaintiff." (emphasis added)). Thus, if every reasonable jury would conclude that AST would have terminated Yurk's employment even if Yurk had not reported or was not about to report AST's more-expensive, reusable design, then AST is entitled to summary judgment. Or, restated, could a reasonable jury find that Yurk would have kept his job had AST not known that he had reported to an attorney and might report to the City? The Court believes that the answer is "no."

## 1.

That is not to say that Yurk has nothing supporting his position. (*See* R. 36, PID 700–01.) Parts of the record, when examined in isolation, might suggest that Yurk's performance and inability to work on a team were not the real reasons AST fired him. Yurk worked on projects for Bechtel Marine and the College of American Pathologists for which the record does not reveal any complaints. And he received a "satisfactory" rating on his performance review, a raise, and a bonus in 2015. Add to this that Yurk was an experienced software developer and that Pravin suggested that the market forced employers to think twice before letting a developer go. And while Vargas (the project manager on the City project) had limited interaction with Yurk, she testified that she found Yurk to be "pleasant." (R. 34, PID 506.) Shyam likewise testified that Yurk was "a very respectable person." (R. 34, PID 506.) Further, Yurk and Baig made amends with Yurk even sending Baig a card that Baig said he would treasure forever. (R. 34, PID 402.)

And parts of the record might suggest that the real reason AST fired Yurk was because he had reported to an attorney, and might report to the City, AST's more-expensive, reusable design. (The Court continues to proceed under the assumption that Yurk engaged in activity protected by the WPA by reporting to an attorney and by being "about to report" to the City.) First, AST management (Brocker, Vargas, and Pravin) was aware that Yurk had engaged in this conduct. Second, taking the facts in the light most favorable to Yurk, Brocker told Yurk that Shyam, Baig, and Kant were "nervous over [Yurk's] questions about the SOA design for Detroit." (R. 36, PID 789.) And while Brocker later clarified what he meant by "nervous," he did indicate that Yurk should not raise unfounded issues with the City. (R. 36, PID 789.) Third, after Baig mentioned that AST's work for the City was to create a product, Kant made attempts to correct Baig's statement. And Pravin still met with Yurk to discuss the legality of AST's actions

after Brocker and Shyam had recommended Yurk's termination. Add to this the timing: only a week or so after Yurk first mentioned to Vargas that he was going to contact an attorney did Shyam and Brocker recommend that Yurk be terminated. Brocker did not see Yurk's lengthy email saying that he had gone to an attorney and was thinking about reporting to the City until July 14 and Brocker recommended Yurk's termination the very next day.

Thus, there is evidence—when taken out of context—sufficient for a reasonable jury to find that Yurk's report to an attorney and the possibility he might report to the City "made a difference" in AST's decision to terminate Yurk. *See Hazle*, 628 N.W.2d at 522; *see also* Mich. Model Civ. JI 107.03.

## 2.

But a jury is entitled to the full picture. And in determining whether a genuine issue of material fact exists, the Court must analyze the entire record. Once the parts of the record that favor Yurk are put in context, no reasonable jury could find that Yurk's report to his attorney or threat to possibly report to the City made any difference in AST's decision to terminate him.

Consider first the complete record of Yurk's performance. It clearly shows that Yurk's superiors did not think he performed well on the website project or the Underwriters Laboratory project. As far as the website project, Shyam was dissatisfied to the point where he gave Brocker the option of terminating Yurk. As for the Underwriters Laboratory project, Shyam testified, "So [Yurk] was supposed to be leading that project, and we used to have a lot of issues, challenges; the quality of the report was not good, data was not right." And Brocker recalled having to handle tasks that he had expected Yurk to handle. Indeed, only six months into Yurk's employment at AST, Brocker talked with Yurk about "whether or not [Yurk] wanted to start looking for another position." (R. 34, PID 434.) And while Brocker testified that Yurk's

"satisfactory" performance rating was accurate, he also testified that he gave Yurk that rating "to give him . . . a chance and not take him down so early in his tenure with AST." (R. 34, PID 445.) Brocker further explained, "I put down a satisfactory mark because I truly thought that, you know, he was going to work through some of the things that we had encountered." (R. 34, PID 434.) Thus, the more complete picture shows that even before the City project, Brocker—the person whose recommendation weighed most heavily in Yurk's termination—was concerned about Yurk's performance and was "trying to work with him and turn him around, give him an opportunity." (*See* R. 34, PID 445, 459.)

Now consider the complete record of Yurk's ability to work professionally on a team. Start with Yurk's own recognition of his abrasiveness and his need to apologize for certain of his conduct. Even if Yurk (unlike Vargas and Shyam) did not accept Kant as his superior, it remains that Kant was Yurk's teammate on the City project and that Yurk did not treat Kant with respect. For instance, at a meeting with the manager of the City project, the "MK" issue was raised, yet Yurk showed no remorse or willingness to stop—he instead said that he would continue to call Kant "MK." There was also the incident where Yurk stared at Kant for 30 seconds, leaned over Kant's desk, and stated, "You'll get respect when you give it, MK." (R. 41, PID 913.) Yurk told his brother that he had "finally cracked [Kant] a bit." (R. 41, PID 913.) And Kant testified that this incident was the "final reason" for requesting Yurk's removal from the City project. Indeed, Kant recalled telling HR, "I cannot work with a person who is willfully disrespecting, unprofessional and threatening in a professional situation[.]" (R. 34, PID 482.) And while Yurk and Baig ultimately made amends, it remains that Baig filed an HR complaint against Yurk for Yurk's outburst about having to unnecessarily drive into Detroit and that Yurk sent Baig a sarcastic, "hurt[ful]" email. And after her July 9 meeting with Yurk, Vargas told HR that Yurk

had been "combative, argumentative and disrespectful not only with his lead but also towards the Practice leadership and AST as a whole." (R. 34, PID 787.) And Shyam testified that Yurk would sometimes "yell" at him. (R. 34, PID 455.) Thus, completing the picture reveals that Yurk had considerable difficulties working with people staffed on the City project.

Moreover, even assuming a reasonable jury could stretch to find that Yurk's performance and inability to work on a team were not the whole of why Yurk was terminated, this would not be sufficient for Yurk to survive summary judgment. For Yurk "must not merely raise a triable issue that [AST's] proffered reason was pretextual, but that it was a pretext for unlawful retaliation." *Debano-Griffin v. Lake Cty.*, 828 N.W.2d 634, 639 (Mich. 2013) (internal quotation marks omitted); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext *for [retaliation]*' unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.").

On this front, it helps to consider the two scenarios the WPA aims to prevent: (1) an employee is "about to report" a violation or suspected violation of law and the employer learns of this before the employee reports and takes an adverse action and (2) an employee reported a violation or suspected violation of law and the employer learns of this after the report and takes an adverse action. In the first scenario, the employer acts out of fear: the employer fears the public learning of its unlawful activity and hopes that an adverse employment action (or just the threat of one) will prevent the employee from reporting. In the second scenario, the employer is upset about the disclosure and retaliates for that reason. *See West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003) (finding required causal connection for WPA claim lacking where the plaintiff "ha[d] not shown any reaction or conduct on the part of his supervisors that reasonably suggest[ed] that they were upset by" the plaintiff's report). In this second scenario,

the employer might be additionally motivated to take an adverse action against the reporting employee to intimidate other employees and discourage them from reporting. Thus, the WPA aims to prevent an employer from retaliating out of fear of disclosure, out of upset over a disclosure, and out of a desire to intimidate.

Here, the record taken as a whole does not show that anyone at AST had any fear that Yurk might disclose unlawful activity to the City, that anyone at AST was upset that Yurk had disclosed unlawful activity to an attorney, or that anyone at AST wanted to terminate Yurk to set an example for others.

True, as discussed, the City project was important to AST and Brocker did tell Yurk that Shyam, Baig, and Kant were "nervous" about Yurk's questions. But again, context matters. In a subsequent email to Yurk, Brocker explained what Shyam, Baig, and Kant were nervous about: "I thought I was clear, but maybe not. I said that the reason they would be nervous is if you start making unfounded statements to the customer before checking your facts. Speaking out of your own fear and causing unnecessary confusion with the customer." (R. 36, PID 789.) In that email, Brocker also told Yurk that he did not have "any reason" to think that AST would be sued by the City, that AST's typical process was for designs to be approved by the customer, and that he had "no reason" to think that the usual process was not being followed. (R. 36, PID 789.) Thus, the more complete record shows that Brocker—the person whose opinion mattered most in Yurk's termination—simply did not think that Yurk had caught AST doing anything wrong and thus had no reason to fear a report to the City or be upset about a report to an attorney. What Brocker may have feared was Yurk confusing a customer with unfounded questions, but that is not what the WPA aims to prevent.

The same holds for other AST employees. Start with Kant. He repeatedly said that the design had been approved by the City. Indeed, moments after Yurk first questioned the design, Kant told Yurk that "[t]hese discussions and reviews have already been done and appropriate design was created as a result." (R. 36, PID 770.) And when interviewed by AST's CEO, Kant told Pravin that various approaches were discussed with the City, that the chosen implementation was the best option, and that it had been approved by the City. (R. 34, PID 527.) Pravin asked Kant to see the "presentations that were used to explain and discuss various options with the City" and Kant did so "immediately" following their interview. (R. 34, PID 527.) That is not the behavior of someone with something to hide. As for Vargas, it is true that when Yurk expressed his concerns to her, she told HR that Yurk was creating "a project risk." (R. 34, PID 787.) But again, read in context, this statement refers not to the fact that Yurk had caught AST doing something unlawful, but to the fact that Yurk "was combative, argumentative and disrespectful" and "creating a hostile work environment." (*See* R. 34, PID 787.) As for Shyam, when he was informed about Yurk's concerns, he "laughed" because "it was not something that we were doing." (R. 34, PID 458.) And when Pravin, AST's CEO, learned of Yurk's concerns about the design, he conducted a seemingly thorough investigation that led him to believe that AST's implementation was lawful—including reading the parties' contract. Just as important, he shared his results with Yurk and explained why Yurk's concerns were unfounded.

In short, nothing suggests that any AST employee—Brocker, Shyam, Baig, Kant, Vargas, or Pravin—had any concern that the multiple-interface design for the City was unlawful or even problematic. To the contrary, AST believed that the reusable, more-costly design had been approved by the City and that it had the intellectual property rights to reuse the design. And if that is so, why would AST fear Yurk reporting the design to the City or be upset that Yurk

reported the design to an attorney such that it was motivated to terminate his employment? *See Saulter v. Detroit Area Agency on Aging*, 562 F. App'x. 346, 355–356 (6th Cir. 2014) (affirming the grant of summary judgment on WPA claim where there was no evidence to suggest the employer considered plaintiff to be a "troublesome whistleblower or that the decision to eliminate her position and discharge her was motivated by resentment over her reporting or being about to report the vendors' violations of regulations and health standards"); *Debano-Griffin*, 828 N.W.2d at 639 ("[I]t is reasonable to conclude that the more an employer is affected by the plaintiff's whistleblowing activity, the stronger the causal link becomes between the protected activity and the employer's adverse employment action."); *Buell v. Grand Blanc Twp.*, No. 303696, 2012 WL 3020795, at *4 (Mich. Ct. App. July 24, 2012) (affirming the grant of summary judgment in favor of the defendant township where there was no evidence that the township "had a negative reaction to" plaintiff's reporting activity and board members testified that they were not bothered by plaintiff's reporting activity and that the decision to terminate plaintiff was purely financial).

As for the fact that Brocker and Shyam had recommended Yurk's dismissal but thought that the planned discussion between Pravin and Yurk should still take place, this would not persuade a reasonable jury that AST was attempting to silence Yurk. Yurk merely "conjecture[s]" that "[Kant] in his thinking would have said, yeah, let Pravin talk to him and maybe that will shut him up after we fire him." (R. 34, PID 423–24.) But it appears that it was Brocker and Shyam—not Kant—who thought that Pravin should still meet with Yurk. Moreover, Yurk's theory ignores Pravin's testimony that there were occasions where a recommended dismissal would not be finalized.

That leaves timing as evidence that AST retaliated. As discussed, Brocker and Shyam recommended that Yurk be terminated only about a week after Yurk first mentioned going to an attorney. And that recommendation was the day after Brocker saw Yurk's lengthy email referencing Brian Kim, speaking with an attorney, and possibly speaking with the City.

But under Michigan law, temporal proximity alone does not establish the causal connection required to establish a WPA claim. *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 472–73 (Mich. 2003); *see also Taylor v. Modern Eng'g, Inc.*, 653 N.W.2d 625, 630 (Mich. Ct. App. 2002). (Although *West* relied in part on Sixth Circuit law and subsequent Sixth Circuit authority says that temporal proximity alone can sometimes suffice to establish causation, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008), it appears that the Michigan Supreme Court has not changed its position, *see Debano-Griffin*, 828 N.W.2d at 639 (citing *West*'s test with approval); *West v. Wayne Cty.*, 672 F. App'x 535, 542 (6th Cir. 2016) (same); *Smith v. Gavulic*, No. 15-10288, 2017 WL 131557, at *15 (E.D. Mich. Jan. 13, 2017) (same), *aff'd* 694 F. App'x 398 (6th Cir. 2017).) And, as already discussed at length, there is little else in the record (when viewed in context) indicating that AST was motivated to fire Yurk because he reported or was about to report its design for the City project.

Additionally, the timing is less favorable to Yurk than it appears at first blush. Yurk first raised his concerns about the design to Brocker on July 7, but Brocker apparently did nothing at that time other than have a discussion with Yurk. And while Brocker did not see Yurk's lengthy email referencing Brian Kim, going to an attorney, and possibly going to the City until the day before he recommended Yurk's dismissal, the record suggests there were intervening events between reviewing that email and recommending Yurk's termination. The morning after Brocker responded to Yurk's lengthy email by reassuring Yurk that everything was fine, Yurk persisted:

"I'd like to discuss this. This is not true." (R. 41, PID 917.) And that morning Yurk also filed a formal HR complaint against Shyam—for something Shyam had done many months before. Later that day, Beach had a conference call with Brocker and Shyam and noted that they had "changed their stance" and were recommending dismissal. (R. 36, PID 792.) Thus, there may have been conduct on Yurk's part that contributed to Brocker's and Shyam's recommendation that occurred after Brocker saw Yurk's email about reporting to an attorney and possibly reporting to the City.

To sum up, the record taken as a whole strongly indicates that AST fired Yurk because his performance had been subpar prior to the City project and then, instead of turning things around via the City project, Yurk failed to work well with members of that project team. The record taken as a whole also strongly indicates that AST thought that it was doing nothing wrong and thus had little reason to be upset at Yurk for, or concerned about, any report he did make or might make about the design of the City project. Together, this evidence would lead any reasonable jury to find that Yurk's report to an attorney or indication that he might someday decide to report to the City made no difference in AST's decision to terminate his employment. *Hazle*, 628 N.W.2d at 522; *see also* Mich. Model Civ. JI 107.03.

## IV.

For the foregoing reasons, the Court GRANTS AST's motion for summary judgment (R. 34) and finds in favor of AST on Count I of Yurk's second amended complaint (R. 22).

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: January 17, 2018                          U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 17, 2018.

s/Keisha Jackson
Case Manager